# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

G. MARTIN BURROWS,             )
                                    )
         Plaintiff          )
                                    )
   vs.                       )     CASE NO. CV99-HGD-1061-S
                                    )
ST. VINCENT'S HOSPITAL and     )
DR. REX HARRIS, an individual,    )
                                    )
        Defendants    )

## MEMORANDUM OPINION

This matter is before the undersigned United States Magistrate Judge based on the consent of all parties in accordance with the provisions of 28 U.S.C. § 636(c) and Rule 73, Fed.R.Civ.P. The Court has taken under submission the evidence and arguments of the parties with regard to the motions for summary judgment filed on behalf of defendants St. Vincent's Hospital [Doc. #19] and Dr. Rex Harris [Doc. #22].

This is a sex discrimination/harassment case arising out of the alleged acts of a physician, Dr. Rex Harris, M.D. (Harris), an orthopedic surgeon who possesses staff privileges at St. Vincent's Hospital (St. Vincent's) located in Birmingham, Alabama. Count One of the complaint alleges that St. Vincent's violated Title VII of the Civil Rights Act of 1964, as amended. Count Two claims that St. Vincent's negligently hired, trained and supervised Harris. Counts Three and

Four charge assault and battery and invasion of privacy against Harris and also seek to hold St. Vincent's accountable for these torts under an agency theory.

Dr. Harris is an orthopedic surgeon who has exercised staff privileges at St. Vincent's since 1972. He is currently the head of the Orthopedics Section of the Department of Surgery.

Plaintiff, G. Martin Burrows (Burrows), worked at St. Vincent's from 1994 until he resigned in January 1999. In June 1995, Burrows became a full-time scrub technician in the Surgery Department.

Plaintiff's immediate supervisor in Surgery was Bill Bross, the Patient Care Supervisor. Bross, in turn, reported to Sherry Winninger, the Director of Surgical Services. Bross made case assignments for all surgical associates working on the Main side of Surgery, while Cherry Prescott, another Patient Care Supervisor, made assignments for those working on the Outpatient side.

On March 13, 1998, Burrows told Mr. Bross that he did not want to work with Dr. Harris because Dr. Harris had touched him in a manner that he considered inappropriate. He claimed that, while he was scrubbing for surgery a few days earlier, Dr. Harris came into the wash area and put his finger in plaintiff's bellybutton, through plaintiff's clothing, moving it in and out. In response to this complaint, Bross immediately changed plaintiff's assignment and reported the complaint to his boss, Ms. Winninger. She, in turn, reported the complaint to the Human Resources Department. That afternoon, Employee Relations Coordinator Julie Makosky interviewed plaintiff and began an investigation. During his initial interview, plaintiff told Makosky about the bellybutton incident and that one day in the preceding couple of months,

2

Dr. Harris had embraced him from behind "real close." He also told her that Dr. Harris patted and rubbed him on the back, and that Harris had asked him about his goatee, though plaintiff did not state exactly what was said at that time.

After interviewing witnesses for three days, Ms. Makosky could not find anyone who could corroborate plaintiff's claim that Harris embraced him from behind or poked him in the bellybutton. However, Ms. Makosky did determine that Dr. Harris did have a tendency to touch associates, both male and female, on the arms or shoulders and called them by nicknames. His nickname for plaintiff, who goes by the surname of Martin, was "Martini" or "Martini Baby." Some of his nicknames for other employees had sexual connotations and some did not.

Thereafter, Ms. Makosky and Betty Williams, the Vice President of Human Resources, met with Harris and discussed plaintiff's complaints as they knew them to be at that time. Harris denied that he had touched plaintiff in an inappropriate way, although he admitted that he called plaintiff "Martini." They ordered Dr. Harris to stop calling plaintiff "Martini" and to stop touching associates. They also reviewed the hospital's policy on harassment and instructed him not to retaliate against plaintiff. Makosky and Williams also confirmed this directive in a letter to Dr. Harris, which they placed in his employee relations file. Plaintiff admits that Dr. Harris' harassment ceased after his March 13, 1998, complaint and that he was only assigned to work with Harris after that on one occasion when Cherry Prescott assigned him to do so on a day that plaintiff was working in the Outpatient Surgery unit. Prescott was unaware that plaintiff was no longer being assigned by Bill Bross to work with Dr. Harris. According to

3

plaintiff, he was not subjected to any harassment by Dr. Harris on that occasion, though he continued to be teased by co-employees regarding the nickname of "Martini" until he resigned in January 1999.

Through deposition testimony and affidavits made in connection with this case, plaintiff has elaborated on the alleged conduct of Dr. Harris.  According to Burrows, Dr. Harris would come into the operating room and speak to the employees.  On occasion, he would take one hand and move it in a circular fashion along the mid-thoracic portion of plaintiff's back.  Plaintiff never pushed Harris' hand away nor asked him to stop doing it.  Plaintiff also asserts that Dr. Harris would take plaintiff's hand and gently stroke it in a suggestive manner during surgery. This would occur when Dr. Harris would need a retractor being held by plaintiff to be moved or held in another position.  This "stroking" occurred only in the course of Dr. Harris taking plaintiff's hand to have him move a retractor.

Burrows also states that he was inappropriately hugged by Harris.  According to plaintiff, about two or three weeks before the March bellybutton incident, someone walked up behind plaintiff and placed his or her hands over plaintiff's eyes.  This person turned out to be Dr. Harris, who plaintiff asserts then stated "Guess who?" and rubbed his penis against plaintiff's buttocks.  Plaintiff states that he pushed Dr. Harris away and asked "What's your problem?" Dr. Harris denies that this conduct occurred.

Dr. Harris also is alleged to have made several objectionable remarks to plaintiff of a sexual nature.  These include plaintiff's allegation that Dr. Harris told him his goatee looked like female genitalia, calling it a "pussy."  He also is alleged to have made a statement "I bet that

4

Martini Baby won't have a problem with that girl. I bet his penis is all she needs." Burrows also claims that Harris asked him about his sexual relationships with women, told him that he was attractive and sexy, stated that "Martini Baby" had a tight butt or ass, that he was "so fine," and that he was "just what the doctor ordered."

Plaintiff admits that prior to March 13, 1998, he never complained to anyone concerning the alleged improper statements or conduct of Dr. Harris. He also admits that after March 13, 1998, Dr. Harris neither touched him nor made any other improper statements to him. At no time did Dr. Harris attempt to see plaintiff outside of the hospital nor did he suggest that if plaintiff did or did not do something that the hospital would punish him.

The record reflects that St. Vincent's has a policy which prohibits any type of harassment, including sexual harassment. The policy defines harassment as "conduct of a nature which causes an intimidating, hostile or offensive working environment, or unreasonably interferes with an individual's work performance." In addition to the anti-harassment policy, St. Vincent's also has what it calls Core Values which set out a list of attributes, such as respect for others, to which each employee is expected to adhere.

St. Vincent's also undertakes educational activities to inform employees about its opposition to harassment. Each associate receives a copy of the personnel handbook which contains a summary of the harassment policy and the Core Values. The complete harassment policy is available to employees both in the employee's department or through the hospital intranet.   St. Vincent's also encourages employees to report any concerns regarding

5

discrimination or harassment through its Value Line, by which employees may make anonymous complaints via a toll-free number.

The Department of Surgery within the hospital also has undertaken a number of steps to educate employees about harassment. With each new employee, the Department reviews the handbook, including the harassment policy. It also occasionally reviews the policy at bi-monthly staff meetings. Furthermore, copies of the harassment policy are posted on the Department of Surgery bulletin board. St. Vincent's also trains its supervisory employees on discrimination and harassment issues. New supervisors take a basic management course, a portion of which discusses EEO and harassment issues. St. Vincent's also holds training seminars for supervisors and managers, including legal policy updates for management personnel.

Physicians who have privileges at St. Vincent's agree to abide by the Medical Staff By-Laws. These specifically require that the doctors support the hospital's mission and policy, contribute to a work environment that is free of harassment, and abide by the hospital's policies and rules. Dr. Harris is aware of St. Vincent's anti-harassment policy.

With regard to Dr. Harris' status as an employee of St. Vincent's, the evidence is undisputed that Dr. Harris receives no salary from St. Vincent's Hospital. Dr. Harris maintains an office in the St. Vincent's medical office complex as a tenant of St. Vincent's. He is a self-employed physician. Dr. Harris does not have the authority to hire, fire or discipline operating room staff and does not do performance appraisals of any hospital support staff. The assignments to the operating room are made by St. Vincent's personnel, and Dr. Harris is not involved in these scheduling matters. Though he is the head of the Orthopedic Department,

6

his job duties involve relations with other physicians who work in Orthopedics and have hospital privileges. This position gives him no authority over hospital support staff.

## DISCUSSION

### Summary Judgment

This matter is considered by the court pursuant to the provisions of Rule 56, Fed. R. Civ. P. Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91 L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines whether an element is essential. *Liberty Lobby*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Liberty Lobby*, 477 U.S. at 252, 106 S.Ct. at 2512. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id*. at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

Discrimination

Title VII of the Civil Rights Act of 1964 makes it unlawful for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n.6, 101 S.Ct. at 1093-94 & n.6. Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095. The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff. *Id.* at 253, 101 S.Ct at 1093.

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra*, at 253, 101 S.Ct. at 1093. In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977). The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it

9

> bears on the critical question of discrimination." *Furnco, supra*, 438 U.S. at 577, 98 S.Ct. at 2949. Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant. The district court has before it all the evidence it needs to decide whether "the defendant intentionally discriminated against the plaintiff." *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093.

*U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983).

A *prima facie* claim of sexual harassment in a "pure hostile work environment action" usually necessitates the establishment of five elements. Plaintiff must establish that: (1) he belongs to a protected class; (2) he was subjected to unwelcome sexual harassment; (3) the conduct was based on sex; (4) the harassment affected a "term, condition or privilege" of employment; and (5) *respondeat superior*. Where, as here, the plaintiff seeks to hold the employer responsible for the hostile environment created by the plaintiff's "co-worker,"[1] he must show that the employer knew or should have known of the harassment in question and failed to take prompt remedial action. *Henson v. City of Dundee*, 682 F.2d 897, 903-05 (11th Cir. 1982); *Coates v. Sundor Brands*, 164 F.3d 1361, 1368 (11th Cir. 1999); *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir. 1999).

---

[1] Dr. Harris may not be a "co-worker" because he may not be an employee of St. Vincent's. Nevertheless, these rules still apply to him, even assuming he is an independent contractor. When an employee's ability to perform his or her job is compromised by discriminatory acts such as sexual harassment committed by a private party and the employer knows it, it has the responsibility to address the problem. *Coates v. Sundor Brands, Inc.*, 164 F.3d 1361, 1366 (11th Cir. 1999). Because Dr. Harris did not supervise plaintiff, employer liability for discrimination by a supervisor as set out in *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), does not apply.

Title VII Claim

Defendant, St. Vincent's Hospital, asserts with regard to Count One, *inter alia*, that plaintiff has (1) failed to prove that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment and (2) failed to show that St. Vincent's knew or should have known of the alleged harassment of plaintiff by Dr. Harris.

Requiring a plaintiff to prove that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment is necessary to ensure that Title VII does not become a mere "general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-84, 141 L.Ed.2d 662 (1998).  This requirement is regarded "as crucial, and as sufficient to ensure that courts and juries do not mistake ordinary socializing in the workplace–such as male-on-male horseplay or intersexual flirtation–for discriminatory 'conditions of employment.'" *Gupta v. Florida Board of Regents*, 212 F.3d 571, 583 (11th Cir. 2000), quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998).  In order to establish this factor, a plaintiff must not only establish that he subjectively perceived the environment as hostile and abusive, but also that such a perception is objectively reasonable; that is, that a reasonable person would perceive the environment to be hostile and abusive. *See Mendoza*, 195 F.3d at 1246; *Faragher*, 524 U.S. at 788, 118 S.Ct. at 2284.

11

St. Vincent's concedes that plaintiff subjectively perceived his environment to be sexually hostile. However, it asserts that, under the facts of this case, that perception was not an objectively reasonable one.

Regarding the objective prong of this element, the statements and conduct complained of are examined collectively to determine whether they are sufficiently pervasive or severe to constitute sexual harassment. See Mendoza, 195 F.3d at 1242. In undertaking this analysis, the Court will assume that the conduct and statements made by Harris were of a sexual nature.[2] When the complained-of conduct or statements are of a sexual or gender-related nature, there are four factors that are considered in determining whether they are sufficiently severe and pervasive from an objective standpoint to alter an employee's terms and conditions of employment: "(1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or merely an offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance." Id. at 1246.

Although the actions recounted by plaintiff were undoubtably annoying and offensive, many decisions throughout the circuits have rejected sexual harassment claims based on actions that are as serious or more serious than the conduct at issue here. See Shepherd v. Comptroller of Public Accounts of Texas, 168 F.3d 871, 872-75 (5th Cir. 1999) (holding that several instances over a two-year period, including the comment "your elbows are the same color as your

_____

[2] Before they are considered in determining whether the severe or pervasive requirement is met, the statements and conduct must be of a sexual or gender-related nature. Mendoza, 195 F.3d at 1245.

12

nipples," another comment that plaintiff had big thighs, touching plaintiff's arm, and attempts to look down the plaintiff's dress, were insufficient to support a hostile environment claim); *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 768 (2d Cir. 1998) (holding that statement that plaintiff had the "sleekest ass" in the office plus a single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to alter the terms or conditions of plaintiff's employment); *Adsumilli v. City of Chicago*, 164 F.3d 353, 357 (7th Cir. 1998) (holding actions insufficient to support a hostile environment claim where co-employees teased plaintiff, made sexual jokes aimed at her, asked her what "putting one rubber band on top and another on the bottom means," commented about her low neck tops, repeated staring at her breasts with attempts to make eye contact, and four incidents of touching her arm, fingers or buttocks); *Sprague v. Thorn Americas, Inc.*, 129 F.3d 1355, 1365-66 (10th Cir. 1997) (holding five sexually-oriented, offensive statements over 16 months insufficient to show hostile environment, even though one of the harasser's statements occurred while he put his arm around plaintiff, looked down her dress and said, "well, you got to get it when you can."); *Hopkins v. Baltimore Gas & Electric Co.*, 77 F.3d 745, 753-54 (4th Cir. 1996) (holding evidence that the harasser "bumped into [the plaintiff], positioned a magnifying glass over [the plaintiff's] crotch, flipped his tie over to see its label, gave him a congratulatory kiss in the receiving line at [a] wedding , and stared at him in the bathroom" insufficient to establish Title VII violation); *Black v. Zaring Homes, Inc.*, 104 F.3d 822, 823-24 (6th Cir. 1997) (reversing jury verdict and finding conduct was "sex-based" but insufficiently severe or pervasive to state actionable claim, where conduct over a four-month period involved repeated sexual jokes; one

13

occasion of looking plaintiff up and down, smiling and stating, there's "Nothing I like more in the morning than sticky buns;" suggesting that land area be named as "Titsville" or "Twin Peaks;" asking plaintiff; "Say, weren't you there [at biker bar] Saturday night dancing on tables?"; stating, "Just get the broad to sign it;" telling plaintiff she was "paid great money for a woman"); *Weiss v. Coca-Cola Bottling Co. of Chicago*, 990 F.2d 333, 337 (7th Cir. 1993) (holding plaintiff's claims–supervisor repeatedly asked about her personal life, told her how beautiful she was, asked her on dates, called her a dumb blond, put his hand on her shoulder at least six times, placed "I love you" signs in her work area, and tried to kiss her once in a bar and twice at work–were not sufficient for actionable sexual harassment); *see also Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 263 (5th Cir. 1999) ("All of the sexual hostile environment cases decided by the Supreme Court have involved patterns or allegations of extensive, long-lasting, unredressed, and uninhibited sexual threats or conduct that permeated the plaintiff's work environment.").

An examination of the factors set out above demonstrates that Burrows did not endure conduct that was so severe or pervasive that it altered the terms or conditions of his employment and created a discriminatorily abusive working environment.

Plaintiff worked with Harris from 1993 until approximately March 1998. During that time plaintiff alleges only two occasions in which Dr. Harris engaged in conduct that might be interpreted as overtly sexual in nature. On one occasion Harris is alleged to have placed his hands over Burrows eyes and said "Guess who?" thereafter pressing his penis against plaintiff's rear end, while both were fully clothed. On another, he asserts that Harris poked him in the

14

bellybutton, through his clothing, moving his finger as if simulating intercourse.  Thus, the frequency of conduct of this nature is low.

Burrows also claims that Harris would occasionally grab his hand during surgery and stroke it in a suggestive manner.  However, he admits that this "stroking" occurred when Harris would take plaintiff's hand in order to move a retractor being held by Burrows to another position or location to accomplish the ongoing surgery.

Plaintiff also inferred sexual connotations from the fact that Harris would enter the operating room area and occasionally rub his back.  However, Harris also did this to other personnel, both male and female.  Though this conduct also may have made others besides plaintiff uncomfortable, this conduct and the "stroking" referenced above is neither physically threatening or humiliating, nor is it severe in nature.

 It is also alleged that Harris referred to plaintiff as "Martini" or "Martini Baby."  Though plaintiff believed sexual connotations were inferred by this nickname, it is also reasonable to assume that it was merely a play on plaintiff's name, Martin.  Plaintiff also alleges seven incidents where Harris spoke to him or about him in a sexually vulgar or invasive manner. Statements such as "Martini Baby is so fine," and "Martini is just what the doctor ordered," cannot objectively be viewed as humiliating.  Asking plaintiff about his sexual relationships with women he dated and telling him he has a "tight ass" and was attractive and sexy are only slightly more severe.  This leaves only the comments wherein Harris is alleged to have told plaintiff that his goatee looked like female genitalia and wherein he is alleged to have stated that "I bet Martini Baby won't have a problem with that girl.  I bet his penis is all she needs."  Given the

15

five years of contact between plaintiff and Harris, the frequency of this conduct is relatively low, none of the statements are physically threatening and, while some of the comments could be considered humiliating, the extent of the humiliation is lacking in severity. In addition, plaintiff never complained about this or any other allegedly harassing conduct by Harris until his March 13, 1998, complaint. None of this conduct unreasonably interfered with plaintiff's job performance. In fact, there is no evidence that it affected it at all.

Therefore, after weighing all of the factors set out above and comparing the conduct in which Harris is alleged to have engaged with that outlined in other cases of alleged "hostile environment" sexual harassment cases, it is clear that plaintiff's belief that he was subjected to a sexually hostile environment is not objectively reasonable.

However, even if it were to be assumed that plaintiff's perception of his environment was objectively reasonable, he has another major hurdle to cross. That is, he must show that St. Vincent's knew or should have known of the harassment in question and failed to take prompt remedial action. *Coates*, 164 F.3d at 1368. Simply put, he cannot do this. The sexual harassment policy for St. Vincent's clearly sets out the steps to be taken by an employee who believes he or she has been subjected to sexual harassment. It states:

> An associate that feels that he or she has been subjected to harassment (including sexual harassment) should immediately report the incident to his or her supervisor. In the event the supervisor is perceived to be a part of the problem, the associate should report the situation to the next higher level or to the Employment and Employee Relations Manager. The management person receiving the complaint will confer with the Employment and Employee Relations Manager, and determine what corrective action is warranted.

16

[Plaintiff's Depo., Defendant's Exh. 11].

Plaintiff did not make a formal complaint concerning Dr. Harris until March 13, 1998. In addition, at the time of his initial complaint, plaintiff did not report that Dr. Harris had pressed his penis against him or used a vulgar term to describe his goatee. He initially only reported the nickname, the poking of the bellybutton, and Dr. Harris coming up to him "real close" from behind.

The evidence is undisputed that once plaintiff made his complaint, St. Vincent's acted immediately. Plaintiff's work assignment was changed so that he would not have to work with Dr. Harris. Thereafter, he, through inadvertence, was assigned to work with him on one other occasion during which no harassment occurred. In addition, plaintiff's supervisor who received his complaint, Mr. Bross, immediately contacted his supervisor, Ms. Winninger, who immediately sent plaintiff to the Employee Relations Coordinator, Ms. Makosky. Plaintiff was interviewed by Makosky that same day, and Makosky began an investigation that ultimately resulted in numerous interviews with other employees who worked with Dr. Harris.

After completing the interviews, Ms. Makosky and Betty Williams, Vice President of Human Resources, met with Dr. Harris. Dr. Harris was told to stop calling plaintiff "Martini" and to stop touching associates. They also reviewed the St. Vincent's harassment policy with him and followed up the meeting reiterating their discussion and admonitions to him in a letter, which they placed in his Employee Relations file. St. Vincent's took all of these steps within two weeks of plaintiff's complaint. Plaintiff admits that, after his March 13, 1998 complaint, he never again was harassed by Dr. Harris.

17

Plaintiff asserts that St. Vincent's had actual notice of Dr. Harris' inappropriate conduct because plaintiff's supervisor was being subjected to the same inappropriate touching. This claim has no support in the record. Bross testified that at times, while he was sitting in the control room, Dr. Harris would come up from behind him and place his hand on his shoulder. This would sometimes surprise Bross, causing him to be startled, but he did not consider it inappropriate. He testified that he thought of it as "a friendly how-are-you-doing type thing." [Bross Depo. at 71]. There is no evidence that Bross was aware of any of the other conduct alleged by Burrows except for the "Martini" nickname, and plaintiff never complained about this to anyone until March 13, 1998. This is simply insufficient to have put St. Vincent's on notice that Dr. Harris was engaging in sexually harassing behavior.

Plaintiff also asserts that Dr. Harris continually harassed plaintiff and that this harassment continued after he reported Dr. Harris' conduct on March 13, 1998. As evidence of this claim, Plaintiff asserts that plaintiff continued to be called nicknames until the day he left the employ of St. Vincent's. However, a review of the testimony reflects that none of the conduct attributed to Dr. Harris by plaintiff occurred after March 13, 1998. The nicknames and teasing that he alleges he was subjected to after that date occurred when he was addressed by co-workers, not by Dr. Harris.

Likewise, plaintiff's assertions that Dr. Harris is alleged to have continued to use nicknames for some employees and touch some employees after his complaint are irrelevant. The only relevant determination is whether St. Vincent's took sufficient action to end Dr. Harris'

18

alleged harassment of plaintiff.  In view of his own admission that he never again was harassed
by Harris after his complaint, it is clear that the hospital's steps were immediate and effective.

On the record, no genuine issue of material fact exists to support a finding that St.
Vincent's Hospital was either aware of or should have been aware of the conduct attributed to
Harris by plaintiff before his complaint on March 13, 1998, or that it responded unreasonably
to his complaint.  Therefore, the motion for summary judgment of St. Vincent's as to Count One
of the complaint (Title VII claim) is due to be granted and Count One is due to be dismissed
with prejudice.


State Law Claims

Plaintiff's only remaining claims against defendants are state law claims.  The Court *sua
sponte* may raise a defect in jurisdiction at any time.  *Barnett v. Bailey*, 956 F.2d 1036, 1039
(11th Cir. 1992); *Fitzgerald v. Seaboard System R.R., Inc.*, 760 F.2d 1249, 1251 (11th Cir. 1985).
Therefore, the Court will examine whether it continues to have jurisdiction over this action at
this time.

Since plaintiff is an Alabama domiciliary and defendants are Alabama domiciliaries,
diversity does not exist.  *Strawbridge v. Curtiss*, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806).
Thus, there is no basis for original federal jurisdiction over plaintiff's state law claims against
defendants.  The state law claims previously were before the court properly as supplemental
claims supported by plaintiff's federal question claim.  *See* 28 U.S.C. § 1367(a) (1994).
However, with the dismissal of plaintiff's federal claim, there remains no independent original

19

federal jurisdiction to support the Court's exercise of supplemental jurisdiction over the state law claims against defendants.

The Court must now inquire into whether a jurisdictional basis exists to support plaintiff's state law claims in federal court. The Court's inquiry is twofold. First, the Court must decide whether it has the power to hear the state law claims. Second, if the Court does have the power to hear the state claims, the Court must decide whether, in its discretion, it will retain jurisdiction over the state claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725-26, 86 S.Ct. 1130, 1138-39, 16 L.Ed.2d 218 (1966).

When plaintiff filed his complaint, he had a federal question claim against defendants, and plaintiff's state law claims against defendants were a proper exercise of the Court's supplemental jurisdiction. *See* 28 U.S.C. § 1367(a) (1994); *see also Palmer v. Hospital Authority of Randolph County*, 22 F.3d 1559, 1567 (11th Cir. 1994). The dismissal of plaintiff's underlying federal question claim does not deprive the Court of supplemental jurisdiction over the remaining state law claims. See *Palmer*, 22 F.3d at 1568; *Edwards v. Okaloosa County*, 5 F.3d 1431, 1433-35 (11th Cir. 1993). Under 28 U.S.C. § 1367(c), the Court has the discretion to decline to exercise supplemental jurisdiction over non-diverse state law claims, where the Court has dismissed all claims over which it had original jurisdiction, but is not required to dismiss the case. *See Palmer*, 22 F.3d at 1567-68. As the Eleventh Circuit made clear in *Palmer*, once a court decides that it has power to exercise supplemental jurisdiction

20

under § 1367(a), then the court should exercise that jurisdiction, unless § 1367(b) or (c) applies

to limit the exercise.[3]

In this case, § 1367(c) applies because the Court "has dismissed all claims over which

it has original jurisdiction," namely, plaintiff's claim against defendant St. Vincent's under Title

VII. While § 1367(c) permits a court to dismiss any state law claims where the court has

dismissed all the claims over which it had original jurisdiction, the court also can consider other

factors. Where § 1367(c) applies, considerations of judicial economy, convenience, fairness,

and comity may influence the court's discretion to exercise supplemental jurisdiction. *See*

---

[3] Title 28 U.S.C. § 1367 states, in pertinent part:

>  (a) Except as provided in subsections (b) and (c) or as expressly provided
> otherwise by Federal statute, in any civil action of which the district courts have
> original jurisdiction, the district courts shall have supplemental jurisdiction over
> all other claims that are so related to claims in the action within such original
> jurisdiction that they form part of the same case or controversy under Article
> III of the United States Constitution. Such supplemental jurisdiction shall
> include claims that involve the joinder or intervention of additional parties.

> (b) . . .

> (c) The district courts may decline to exercise supplemental jurisdiction over a
> claim under subsection (a) if--
>   (1) the claim raises a novel or complex issue of State law,
>   (2) the claim substantially predominates over the claim or claims over which
> the district court has original jurisdiction,
>   (3) the district court has dismissed all claims over which it has original
> jurisdiction, or
>   (4) in exceptional circumstances, there are other compelling reasons for
> declining jurisdiction.

> (d) The period of limitations for any claim asserted under subsection (a), and
> for any other claim in the same action that is voluntarily dismissed at the same
> time as or after the dismissal of the claim under subsection (a), shall be tolled
> while the claim is pending and for a period of 30 days after it is dismissed
> unless State law provides for a longer tolling period.

*Baggett v. First National Bank of Gainesville*, 117 F.3d 1342, 1352-53 (11th Cir. 1997); *Palmer*, 22 F.3d at 1569; *New England Co. v. Bank of Gwinnett County*, 891 F.Supp. 1569, 1578 (N.D.Ga. 1995); *Fallin v. Mindis Metals, Inc.*, 865 F.Supp. 834, 841 (N.D.Ga. 1994).

Resolution of plaintiff's state law claims depends on determinations of state law. State courts, not federal courts, should be the final arbiters of state law. *Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1553 (11th Cir. 1992). When coupled with the Court's discretion to exercise supplemental jurisdiction under § 1367(c), this Court finds that the state law claims remaining in this action are best resolved by the Alabama courts. This is especially true here where the Court is dismissing plaintiff's federal law claim prior to trial. *See Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139 (dismissal of state law claims strongly encouraged when federal law claims are dismissed prior to trial); *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7, 108 S.Ct. 614, 619 n.7, 98 L.Ed.2d 720 (1988) ("When federal law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice."); *Eubanks v. Gerwen*, 40 F.3d 1157 (11th Cir. 1994) (remanding case to district court to dismiss plaintiff's state law claims where court had granted summary judgment on plaintiff's federal law claims). The Court finds that judicial economy, fairness, convenience, and comity dictate having these state law claims decided by the state courts. Therefore, the remaining state law claims will be dismissed without prejudice.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this __13th__ day of March, 2001.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE